**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 21 2012, 9:06 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL T. DOUGLASS**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**CHERRIE WELLS**
DCS, Allen County Office
Fort Wayne, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: B.W., Minor Child, | ) ) ) | |
| | ) | |
| R.C., Father, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 02A03-1204-JT-173 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Charles F. Pratt, Judge
Cause No. 02D08-1107-JT-112

**December 21, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

R.C. ("Father") appeals the involuntary termination of his parental rights to his child, B.W. Concluding that there is sufficient evidence to support the trial court's judgment, we affirm.

## Facts and Procedural History

Father is the biological father of B.W., born in October 1999. The evidence most favorable to the trial court's judgment reveals that in February 2010 B.W.'s biological mother, V.W. ("Mother"), was incarcerated, with an earliest projected release date sometime in 2014. Because Father was unemployed, without stable housing, and serving parole, Father's mother, R.S. ("Grandmother"), agreed to temporarily care for B.W. and his older brother.[1] By August 2010, however, Grandmother felt she could no longer afford to care for B.W. and requested help from the local Allen County office of the Indiana Department of Child Services ("ACDCS").

Later the same month, ACDCS filed a petition alleging B.W. was a child in need of services ("CHINS"). Father admitted to the allegations of the CHINS petition and B.W. was so adjudicated. The court proceeded to disposition the same day, formally removed B.W. from Father's custody, and ordered that the child be made a ward of ACDCS. The court's dispositional order also incorporated a Parent Participation Plan which directed Father to successfully complete a variety of tasks and services designed to

---

[1] Father has several additional children not subject to this appeal. Father's daughters, E.W. and C.W., were placed in a guardianship with their paternal Great Aunt at approximately the same time B.W. and his brother began living with Grandmother. B.W.'s older brother was also adjudicated a CHINS, but he was placed in a planned permanent living arrangement during the pendency of the underlying proceedings. Mother voluntarily relinquished her parental rights to B.W. at the commencement of the termination hearing and does not participate in this appeal. We therefore limit our recitation of the facts to those facts pertinent solely to Father's appeal of the termination of his parental rights to B.W.

address his parenting deficiencies and to facilitate reunification with B.W. Specifically, Father was ordered to, among other things: (1) refrain from all criminal activities, submit to random drug screens, and obey the terms of his parole; (2) secure and maintain a stable source of income sufficient to provide the child with clean, suitable housing and clothing; (3) participate in and successfully complete family counseling; (4) participate in a Family Support Conference; and (5) cooperate with all caseworkers as directed, maintain contact with ACDCS, and accept all announced and unannounced home visits. Father was also granted unrestricted, unsupervised visitation privileges with B.W.

Father's participation in court-ordered reunification services was sporadic from the beginning of the CHINS case and ultimately unsuccessful. Father attended the Family Support Conference, but he refused to engage in family counseling by failing to appear for the first scheduled appointment in February 2011 and then failing to contact the service provider to reschedule until November 2011. Father also failed to secure stable housing, preferring instead to bounce between living with Grandmother and his girlfriend. Although Father attended several of B.W.'s football games and one or two family gatherings, Father failed to visit specifically with B.W. on a regular basis even though the foster parent informed Father that he could have unlimited access to B.W. In 2011, Father participated in only two visits with B.W.

ACDCS eventually filed a petition seeking the involuntary termination of Father's parental rights to B.W. in July 2011. An evidentiary hearing on the termination petition was held in January 2012. During the termination hearing, ACDCS presented substantial evidence establishing Father had failed to remedy the conditions that necessitated

3

removal and continued placement of B.W. outside Father's care. In addition, it was the general consensus of case workers and service providers that Father remained incapable of providing B.W. with a safe and stable home environment. As for the child, ACDCS presented evidence showing B.W. was happy and thriving in foster care.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In March 2012, the court entered its judgment terminating Father's parental rights to B.W. Father now appeals.

## Discussion and Decision

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. When, as here, the trial court makes specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied; see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the trial court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B.,

4

666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

(i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[2]    The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are

---

[2]    We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added). Father challenges the sufficiency of the evidence supporting the trial court's findings as to subsection (b)(2)(B) and (C) of the termination statute cited above. We shall address each argument in turn.

### I. Conditions Remedied/Threat to Well-Being

Indiana Code § 31-35-2-4(b)(2)(B) requires the State to establish, by clear and convincing evidence, only one of the three requirements of subsection (b)(2)(B). Because we find it to be dispositive, we limit our review to Father's allegations of error pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute, namely, whether ACDCS presented clear and convincing evidence establishing that there is a reasonable probability the conditions leading to the removal and continued placement of B.W. outside Father's care will not be remedied. On appeal, Father argues that the efforts he made in inquiring about family counseling and in obtaining stable and suitable housing were "reasonable." Appellant's Brief at 15-16. Father therefore contends the trial court erred in terminating his parental rights.

In terminating Father's parental rights to B.W., the trial court made several detailed findings regarding Father's history of deficient parenting, housing and income instability, and failure to complete and/or benefit from the court-ordered reunification services. Specifically, the trial court acknowledged that Father failed to "maintain contact with [ACDCS] and had not demonstrated an ability to benefit from services." Appellant's Appendix at 25. Regarding Father's housing instability, the trial court specifically found "Father acknowledges that he cannot allow [B.W.] to reside with him

6

at either" the Grandmother's or girlfriend's house, that he "does not believe he has sufficient financial resources to independently provide a home for him[self] and his son," and he is "not currently able to provide his son with a place to live." Id. at 26.

As for Father's failure to visit with B.W., the trial court specifically found that Father was "reminded at a Family Team Meeting that he needed to regularly visit with the child and to secure suitable housing;" however, Father had "only personally visited with [B.W.] on two (2) occasions since the summer of 2011." Id. The court further found: (1) it had been "several months" since Father last visited with B.W. at the time of the termination hearing; (2) Father had failed to visit with B.W. on his birthday and Christmas; and (3) despite the fact there had been "no restrictions on Father's visits" and the foster mother was willing to transport B.W. to Father's home for visits, Father "never made that request." Id.

The court also made several findings pertaining to Father's refusal to engage in family counseling and the Fatherhood Engagement Program. In so doing, the court noted that a referral for family counseling was made in December 2010, that Father was "unavailable" for the "first offered appointment" in January 2011, and that Father "failed to appear for later appointments[,] and the referral was closed." Id. at 27. Although the court acknowledged that Father contacted the provider in November 2011 to inquire about family counseling, the court also pointed out that Father remained on the waiting list at the time of the termination hearing. As for Father's participation in the Fatherhood Engagement Program, which was recommended to assist Father in developing a bond with B.W. and to help address his transportation issues, the court noted that Father

7

attended one session in November 2011 and thereafter failed to participate any further in the program.

Based on these and other findings, the trial court concluded that there is a reasonable probability the reasons for B.W.'s removal from Father's care will not be remedied, stating:

> Father has an historic pattern of placing the responsibility for the care of his children on others. Two daughters, following a CHINS adjudication, were placed with his aunt. He does not financially contribute to their support. His sons, the child in this case and his brother, were first placed in the care of [Grandmother]. She testified that she knew he could not financially support them and did not ask for his help. Within a few months, she asked [ACDCS] to take the boys because she was unable to maintain them in her care. Thereafter, Father found the resources to pay [Grandmother] three hundred dollars ($300.00) per month so that *he* could live part[-]time in her house. The Father does not disagree with his girlfriend or [Grandmother's] refusal to accept the child into their homes notwithstanding the fact that he is paying each substantial sums of money each month toward housing costs. The Father has not cooperated with services to assist him with transportation and he has not completed family counseling as ordered. At the time evidence was closed. The child had been in foster care for over a year and the Father was still unable to provide for his care. The reasons for the child's removal continue to exist today and, given the Father's historic pattern, are unlikely to be remedied.

Id. at 28. A thorough review of the record reveals that clear and convincing evidence supports the trial court's findings and conclusions detailed above.

In recommending termination of Father's parental rights, ACDCS case manager Marie Kidd informed the trial court that Father had never been employed during the underlying proceedings, was complicit in denying ACDCS access to both his girlfriend's and Grandmother's home, was "noncomplian[t]" with visitation despite having been given "full opportunity to spend time with B.W.," and failed to take the CHINS case

8

"serious[ly]." Transcript at 196, 199. When asked what factors led ACDCS to finally seek termination of parental rights, Kidd explained, "[Father] wasn't doing what he needed to do. And he hadn't had any regular visitation with his own son throughout pretty much the whole entire case, since August 2010." Id. at 200. We have previously explained that the "failure to exercise the right to visit one's children demonstrates a lack of commitment to complete the actions necessary to preserve [the] parent child relationship." Lang v. Starke Cnty. Office of Family & Children, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (quotations omitted), trans. denied.

Family and Children Services' Intake Clinician Laura Vojtush likewise testified during the termination hearing. Vojtush confirmed that Father declined the first available family counseling appointment offered in January 2011 and subsequently failed to show for a scheduled appointment in February 2011. Vojtush went on to explain that Father thereafter delayed in initiating any contact with her office for approximately nine months, until November 2011, but by then the referral for services had expired. Notwithstanding Father's failure to contact ACDCS in November 2011 and to request that the counseling referral be renewed, case manager Kidd learned of Father's renewed interest in family counseling during a follow-up conversation with Vojtush and renewed Father's referral on her own initiative. Father remained on the waiting list at the time of the termination hearing.

Father's own testimony lends further support to the trial court's findings. During the termination hearing, Father confirmed that he receives six hundred ninety-eight dollars ($698.00) per month in "disability income," but that he pays Grandmother and his

9

girlfriend a total of approximately six hundred and fifty dollars ($650.00) per month in rent. Transcript at 148. Father further testified that although he had applied for "Section 8 housing" approximately two years earlier and was currently number sixty-eight on the wait list (down from 2000), he remained uncertain as to whether he would be able to support B.W. even with the housing assistance but would "give it a shot." Id. at 143-144.

As for family counseling and visitation with B.W., Father insisted that he "didn't need to go to no (sic) counseling," that he was "strongly against it from the beginning" and that he felt it would be a "waste of my time." Id. at 131-132. Although Father acknowledged that he had been repeatedly told that he could and should visit with B.W., when asked why he failed to do so, Father answered: "[T]o be honest, I really don't have no excuses." Id. at 145.

As noted above, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's *habitual patterns of conduct* to determine the probability of future neglect or deprivation of the child. In re D.D., 804 N.E.2d 258, 266 (Ind. Ct. App. 2004), trans. denied. Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." In re A.H., 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). After reviewing the record in its entirety, we conclude that clear and convincing evidence supports the trial court's specific findings set forth above. These findings, in turn, provide ample evidence to support the court's ultimate decision to terminate Father's parental rights to B.W. Father's arguments to the contrary, emphasizing his self-serving testimony, rather than the evidence cited by the

trial court in its termination order, amount to an impermissible invitation to reweigh the evidence. See D.D., 804 N.E.2d at 265.

## II. Best Interests

We next consider Father's assertion that ACDCS failed to prove termination of his parental rights is in B.W.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. In re M.M., 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

In addition to the findings previously cited, the trial court made several additional pertinent findings relating to B.W.'s best interests. Although the trial court specifically noted that B.W. loves Father, the court nevertheless acknowledged Guardian Ad Litem ("GAL") Michael Harmeyer's testimony recommending termination of Father's parental rights as in B.W.'s best interests, including the GAL's specific testimony that Father is not able to financially support B.W., not able to secure housing for the child, has physical and mental health limitations, and has failed to regularly visit with B.W. The court went on to conclude that "[n]either parent can provide for the child at this time," and that

11

through termination of parental rights, B.W. can be "placed for adoption and can be given a safe and sustainable home." Appellant's Appendix at 28. Based on these and other findings, the trial court concluded that termination of Father's parental rights is in B.W.'s best interests. These findings and conclusion, too, are supported by the evidence.

During the termination hearing, GAL Harmeyer testified that Father had "a significant number of issues or challenges in his life . . . which I think are fairly significant." Transcript at 221. GAL Harmeyer also informed the trial court that "[b]eyond the economic and financial issues" were the "housing and stability" issues, as Father had been without independent housing for several years and was "now reliant on his own parents who appear to be of advanced age and frail health themselves," as well as the "generosity of a girlfriend." Id. at 222. GAL Harmeyer expressed additional concern regarding Father's "relatively profound health issues" including Father's "significant problems controlling blood sugar levels and high blood pressure." Id. To that end, Father's own testimony confirmed that despite medication, his blood pressure was "not under control" and that his doctor had described him as a "walkin (sic) time bomb." Id. at 133.

In recommending termination of Father's parental rights as in B.W.'s best interests, GAL Harmeyer testified: "[W]hen you add all of those dynamics up . . . what I see is a father who is simply not able to raise B.W. as a single parent. . . . [T]he challenges that [Father] faces as I see them are too significant both in number and in terms of severity . . . and he just doesn't have enough left over for his son." Id. at 223. Similarly, when asked why she recommended termination of Father's parental rights as in

12

B.W.'s best interests, case manager Kidd answered, "B.W., he's such a good kid. He is, and he deserves to have either one supportive loving parent or two (2) supporting loving parents that want a child and want to be a part of their [sic] life." Id. at 202. When asked whether Father could provide that type of environment for B.W., Kidd answered "no." Id.

Based on the totality of the evidence, including Father's unresolved struggle with housing and financial instability, failure to visit with B.W., and failure to meaningfully engage in reunification services throughout the underlying proceedings, coupled with the testimony from case manager Kidd and GAL Harmeyer recommending termination of the parent-child relationship, we conclude that there is sufficient evidence to support the trial court's determination that termination of Father's parental rights is in B.W.'s best interests. See, e.g., In re A.I., 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), trans. denied.

This court will reverse a termination of parental rights "'only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made.'" Matter of A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

13

FRIEDLANDER, J., and PYLE, J., concur.